PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Koontz, S.J.

RYAN AUSTIN COLLINS

v. Record No. 151277

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
MARCH 28, 2019

UPON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

This case returns to us on remand from the United States Supreme Court. It involves an unsuccessful motion to suppress filed in the trial court by Ryan Austin Collins. Convicted of receipt of stolen property, Collins appealed to the Court of Appeals, claiming that the trial court should have excluded evidence obtained by police during a warrantless search of a motorcycle parked on a private residential driveway. The Court of Appeals affirmed the conviction, holding that exigent circumstances justified the search. *See Collins v. Commonwealth*, 65 Va. App. 37, 46-48 (2015). On further appeal to us, we affirmed on a different ground, holding that the automobile exception justified the warrantless search. *See Collins v. Commonwealth*, 292 Va. 486, 488, 506 (2016).

On certiorari review, the United States Supreme Court reversed our decision and held: "This case presents the question whether the automobile exception to the Fourth Amendment permits a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein. It does not." *Collins v. Virginia*, 138 S. Ct. 1663, 1668 (2018). The Court limited its holding to the interplay between the automobile exception and the curtilage doctrine. "We leave for resolution on remand," the Court stated, "whether Officer Rhodes' warrantless intrusion on the curtilage of Collins' house may have been reasonable on a different basis, such as the exigent circumstances exception to the warrant requirement." *Id.* at

1675. On remand, the Commonwealth argues that two independent grounds support the trial court's decision to deny Collins's motion to suppress: the exigent circumstances exception to the warrant requirement and the good faith exception to the exclusionary rule.

I.

The factual background of this case has been fully addressed in the previous opinions and we therefore need not repeat that background here. In our opinion, the exclusionary rule does not apply in this case even if no exigent circumstances existed because, at the time of the search, a reasonably well-trained officer would not have known that the search of the motorcycle, located a few feet across the curtilage boundary of a private driveway, was unconstitutional.[1]

A.

We begin with a settled but often overlooked premise. Standing alone, "[t]he fact that a Fourth Amendment violation occurred — i.e., that a search or arrest was unreasonable — does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). The Fourth Amendment prohibits unreasonable searches and seizures but "says

---

[1] Collins argues that the Commonwealth should not be permitted to raise the good faith exception to the exclusionary rule because it did not rely on the exception earlier in this litigation. We disagree. Under the right-result-different-reason doctrine, an appellee may assert for the first time on appeal a purely legal ground for upholding the challenged judgment. *See Robert & Bertha Robinson Family, LLC v. Allen*, 295 Va. 130, 141 & n.9 (2018); *Rickman v. Commonwealth*, 294 Va. 531, 542 (2017). Moreover, he may do so without filing a cross-appeal or asserting assignments of cross-error. *See Alexandria Redev. & Hous. Auth. v. Walker*, 290 Va. 150, 156 (2015). Similarly, an unsuccessful appellee on remand may raise additional, previously unaddressed grounds in support of the lower court's original decision. *See Virginia Imports, Ltd. v. Kirin Brewery of Am., LLC*, 50 Va. App. 395, 411-12 (2007) (explaining *Nassif v. Board of Supervisors*, 231 Va. 472, 480-81 (1986)). By extension, we have the discretion to hear an appellee's new arguments upon a remand from the United States Supreme Court for consideration of previously unaddressed issues. *See, e.g.*, *United States v. Rodriguez*, 799 F.3d 1222, 1224 n.2 (8th Cir. 2015); *United States v. Lopez*, 453 Fed. Appx. 602, 605 (6th Cir. 2011); *United States v. Castellanos*, 608 F.3d 1010, 1018-20 (8th Cir. 2010).

nothing about suppressing evidence obtained in violation of this command." *Davis v. United States*, 564 U.S. 229, 236 (2011). This textual silence has a simple explanation.

"Historically, the only remedies for unconstitutional searches and seizures were 'tort suits' and 'self-help.'" *Collins*, 138 S. Ct. at 1676 (Thomas, J., concurring) (quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016)).[2] At the time of the Founding, "[t]he exclusionary rule — the practice of deterring illegal searches and seizures by suppressing evidence at criminal trials — did not exist. No such rule existed in 'Roman Law, Napoleonic Law or even the Common Law of England.'" *Id.* (quoting Warren E. Burger, *Who Will Watch the Watchman?*, 14 Am. Univ. L. Rev. 1, 1 (1964)). "The Founders would not have understood the logic of the

---

[2] *See generally* Bradford P. Wilson, Enforcing the Fourth Amendment: A Jurisprudential History 5 (1986) ("The Constitution had been in effect for nearly a century before the Supreme Court found in it any support for the exclusion of evidence procured in violation of the Fourth Amendment. This fact is significant for understanding the revolution in constitutional interpretation achieved by the Court's adoption of the exclusionary rule."); *id.* at 45 ("Evidence obtained by means of an illegal search and seizure has always been admitted in England and was universally admitted in American courts for more than a century after the Revolution."); *id.* at 119 (describing the exclusionary rule as "a method of enforcing the Fourth Amendment never contemplated by the framers and unknown to the common law"); Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 786 (1994) ("Tort law remedies were thus clearly the ones presupposed by the Framers of the Fourth Amendment and counterpart state constitutional provisions. Supporters of the exclusionary rule cannot point to a single major statement from the Founding — or even the antebellum or Reconstruction eras — supporting Fourth Amendment exclusion of evidence in a criminal trial. Indeed, the idea of exclusion was so implausible that it seems almost never to have been urged by criminal defendants, despite the large incentive that they had to do so, in the vast number of criminal cases litigated in the century after Independence."); *id.* at 791-92 (describing the exclusionary rule as "nontextual and unprecedented"); Potter Stewart, *The Road to* Mapp v. Ohio *and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum. L. Rev. 1365, 1381 (1983) ("[T]here is nothing in the events giving rise to the adoption of the fourth or fifth amendments that supports the view that the provisions were intended to require exclusion since, as discussed earlier, common law courts did not exclude evidence simply because it was obtained by unlawful means."); Bradford Wilson, *Enforcing the Fourth Amendment: The Original Understanding*, 28 Cath. Law. 173, 185 (1983) ("Thus, the remedy considered appropriate by the founding generation for a violation of fourth amendment rights, that of trespass, served the purpose not only of redress, but of punishment, deterrence, and morality as well.").

3

exclusionary rule either. Historically, if evidence was relevant and reliable, its admissibility did not 'depend upon the lawfulness or unlawfulness of the mode, by which it [was] obtained.'" *Id.* (alteration in original) (quoting *United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 843 (C.C.D. Mass. 1822) (No. 15,551) (Story, J.)).[3]

B.

Recognizing the absence of any historical basis for the exclusionary rule, the United States Supreme Court has rejected its own earlier "[e]xpansive dicta" that had "suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself." *Davis*, 564 U.S. at 237 (citation omitted). It is not. Instead, the United States Supreme Court has "acknowledge[d] the exclusionary rule for what it undoubtedly is — a 'judicially created remedy' of [that] Court's own making," *id.* at 238 (citation omitted), and not "a personal constitutional right," *Stone v. Powell*, 428 U.S. 465, 486 (1976).

The exclusionary rule does not serve to "redress," *Davis*, 564 U.S. at 236 (citation omitted), or to "repair," *Elkins v. United States*, 364 U.S. 206, 217 (1960), any specific violation under review. The exclusionary rule is a self-limiting, "prudential" doctrine whose "sole purpose . . . is to deter future Fourth Amendment violations," *Davis*, 564 U.S. at 236-37, rather

---

[3] Leading treatises, as Justice Thomas has noted, *see Collins*, 138 S. Ct. at 1676-77 (Thomas, J., concurring), confirm this historic understanding. *See, e.g.*, 1 Simon Greenleaf, A Treatise on the Law of Evidence § 254a, at 393 (John Henry Wigmore ed., 16th ed. 1899) ("[T]hat . . . subjects of evidence may have been . . . unlawfully obtained . . . is no valid objection to their admissibility if they are pertinent to the issue."); 4 John Henry Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 2183, at 2954 (1905) ("[I]t has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence."); *see also* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2184a, at 31, 51 (John T. McNaughton ed., 1961) (stating that the traditional rule of admission "was never doubted" historically and labeling the exclusionary rule a "departure[] from orthodoxy"); *id.* at 31 n.1 ("Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else." (citation omitted)).

than to serve as a "reparation or compensatory dispensation to the injured criminal," *United States v. Janis*, 428 U.S. 433, 454 n.29 (1976) (citation omitted). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.'" *Davis*, 564 U.S. at 237 (alteration and citation omitted).

Even appreciable deterrence, standing alone, cannot justify the application of the exclusionary rule. As the United States Supreme Court emphasized in *Davis*,

> Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. The analysis must also account for the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Id.* (citations omitted).

The "heavy costs" of suppressing the truth, *id.*, should always be a court's "last resort, not [its] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. This deliberateness requirement focuses "the inquiry on the 'flagrancy of the police misconduct' at issue." *Davis*, 564 U.S. at 238 (citation omitted). The rule thus seeks "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. Only in such circumstances can the violation be deemed "patently unconstitutional" or be characterized as "flagrant conduct," *id.* at 143-44, thereby justifying exclusion.

5

C.

When determining whether to apply the exclusionary rule, "[t]he pertinent analysis of deterrence and culpability is objective" and "'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id.* at 145 (citation omitted). "These circumstances frequently include a particular officer's knowledge and experience, but that does not make the test any more subjective than the one for probable cause, which looks to an officer's knowledge and experience, but not his subjective intent." *Id.* at 145-46 (citations omitted).

Lower courts disagree regarding the scope of the good faith exception. Some apply it only when binding appellate precedent had specifically authorized a search or seizure that a later case subsequently deemed unconstitutional. *See, e.g.*, *United States v. Martin*, 712 F.3d 1080, 1081-82 (7th Cir. 2013) (per curiam). These courts abjure any reliance upon an officer's objective, good faith belief unless that belief was based upon binding precedent *specifically authorizing* the particular search or seizure at issue. To accommodate this limited view of the good faith exception, these courts simply rename it as the "Exception for 'Binding Appellate Precedent.'" *See, e.g.*, *United States v. Lara*, 815 F.3d 605, 612 (9th Cir. 2016). In doing so, these courts treat the most obvious *application* of the good faith exception as an exclusive *restatement* of the exception itself.

This view of the good faith exception involves no rigorous cost-benefit analysis as required by the United States Supreme Court. Instead, the "Exception for 'Binding Appellate Precedent,'" *id.*, turns entirely on what constitutes "binding" precedent — a fluid question that could produce inconsistent answers. If a dozen federal circuit courts of appeal have uniformly ruled in favor of the contemplated search while the specific circuit in which an officer conducts

6

the same kind of search has not so ruled, the good faith exception would not apply if, in a later case of first impression, a court in the officer's jurisdiction or the United States Supreme Court invalidated the type of search at issue. Consider also the situation in which a state's highest court has ruled on an issue in conflict with existing precedent from its corresponding federal circuit court of appeal. Which ruling, state or federal, would be "binding" precedent for purposes of applying the good faith exception in state courts? *See generally* Bryan A. Garner et al., The Law of Judicial Precedent 691 (2016) ("[L]ower federal courts don't have appellate jurisdiction over state courts. Hence their decisions aren't binding on the state courts, which have an independent duty to decide questions of federal law as presented." (footnote omitted)).[4]

Justice Breyer, even while opposing the exception, has persuasively explained why the binding-precedent version of it necessarily draws artificial distinctions. In his dissent in *Davis*, joined by Justice Ginsburg, he explained that

> an officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment's bounds is no more culpable than an officer who follows erroneous "binding precedent." Nor is an officer more culpable where circuit precedent is simply suggestive rather than "binding," where it only describes how to treat roughly analogous instances, or where it just does not exist.

*Davis*, 564 U.S. at 258 (Breyer, J., dissenting). "Thus, if the Court means what it now says," Justice Breyer concluded, then "it would place determinative weight upon the culpability of an individual officer's conduct, and . . . would apply the exclusionary rule only where a Fourth Amendment violation was 'deliberate, reckless, or grossly negligent,'" a conclusion that Justice Breyer thought would allow "the 'good faith' exception" to "swallow the exclusionary rule." *Id.*

---

[4] *See, e.g.*, *Cole v. Norfolk S. Ry.*, 294 Va. 92, 97 (2017); *Toghill v. Commonwealth*, 289 Va. 220, 227 (2015).

Some lower courts, however, believe that the United States Supreme Court did mean what it said in *Davis* and that, by saying it so clearly, intended to reinforce the traditional understanding of the exclusionary rule.[5]  Hewing closely to *Davis* and *Herring*, these courts hold that the exclusionary rule has always "place[d] determinative weight upon the culpability of an individual officer's conduct," *id.*, and that the rule has no applicability unless such culpable conduct can be deterred by excluding highly probative evidence.  This view focuses "the inquiry on the 'flagrancy of the police misconduct' at issue" and recognizes that "when the police act with an objectively 'reasonable good faith belief' that their conduct is lawful, or when their

---

[5] The dissent argues that our reliance on *Davis* violates the maxim of *Jones v. Commonwealth*, 293 Va. 29, 56, *cert. denied*, 138 S. Ct. 81 (2017), which recognized that a lower court's "duty to follow binding precedent" of a higher court is limited to "case-specific holdings, not general expressions in an opinion that exceed the scope of a specific holding." (Citation omitted.)  As the dissent sees it, we do just the opposite by allegedly fixing upon broad dicta in *Davis*, *see post* at 37, and then treating them as if they were binding holdings that leave us no choice but to obey, presumably whether we think them correct or not.  In taking this view, the dissent misapprehends the doctrine of stare decisis and its crucial distinction between dicta and holdings.  When applied vertically, stare decisis protects the hierarchy of judicial power by precluding a lower court from declaring the law to be any different from what a higher court's case-specific holding has already declared it to be.  *See* Garner et al., *supra*, at 27 (describing the rule of "vertical precedents" as a subcategory of stare decisis).  This top-down coercion, however, leaves the lower court entirely free — when unconstrained by a higher court's case-specific holding — to discern the specific contours of the law governing the case at hand.  To be sure, it is the lower court's duty to do so.

We view the *Davis* case-specific holding as simply an application (a rather obvious one) of the good faith exception and its attendant assessment of culpability.  What the dissent implicitly characterizes as dicta, we view as the ratio decidendi.  *Cf. id.* at 46 (describing the "ratio decidendi" of a case as a "near-synonym" for the case's holding even though the "concrete holding" is typically "one species or instance" of the "ratio decidendi").  *Davis* did not create the good faith exception.  *Davis* merely applied it.  The dissent is correct that *Davis* applied the exception to a narrow situation.  The dissent is incorrect, however, in assuming that the exception did not preexist *Davis* or that *Davis* somehow constricted the scope of the exception to that case's specific facts.  It is an even greater misunderstanding of stare decisis for our dissenting colleagues to imply that the statements in *Davis* that they find to be disagreeable dicta cannot, by our lights, be found to be persuasive evidence of "what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

8

conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Id.* at 238 (majority opinion) (citations omitted).

One of these courts, the Third Circuit, expressly rejected the binding-precedent narrowing of the good faith exception and held that courts must answer the deterrence question in every case, not just in those preceded by binding precedent:

> To exclude evidence simply because law enforcement fell short of relying on binding appellate precedent would impermissibly exceed the Supreme Court's mandate that suppression should occur in only "unusual" circumstances: when it "further[s] the purposes of the exclusionary rule." . . . We must conduct the same analysis on the facts before us, even in the absence of binding appellate precedent.

*United States v. Katzin*, 769 F.3d 163, 177-79 (3d Cir. 2014) (en banc) (first alteration in original) (citation omitted). The Fourth Circuit, at least in dicta, seems to agree:

> We have serious doubts about [appellant's] narrow view of the good-faith inquiry. Nothing in *Davis* itself supports such an interpretation. Instead, *Davis* merely establishes the inapplicability of the exclusionary rule in one specific circumstance. *Davis* does not, however, alter the general good-faith inquiry which, we reiterate, requires consideration of whether a reasonably well-trained officer would have known that a search was illegal in light of all of the circumstances.

*United States v. Stephens*, 764 F.3d 327, 337 (4th Cir. 2014) (citation omitted).[6]

---

[6] Several other courts have interpreted the United States Supreme Court to have meant what it said in *Davis*, and have stated so in even more explicit terms. *See United States v. Guyton*, No. 11-271, 2013 WL 55837, at *5 (E.D. La. Jan. 3, 2013) (quoting Justice Breyer's dissent to indicate that the Court did mean what it said and thus intended to make "the relevant inquiry . . . whether it was objectively reasonable to rely on" a particular precedent), *aff'd sub nom. United States v. Berry*, 664 Fed. Appx. 413, 416-18 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1391 (2017); *United States v. Rose*, 914 F. Supp. 2d 15, 24 (D. Mass. 2012) (quoting Justice Breyer's dissent and stating that "[t]his Court presumes that the Supreme Court meant what it said in *Davis*"), *aff'd*, 802 F.3d 114 (1st Cir. 2015); *United States v. Leon*, 856 F. Supp. 2d 1188, 1194-95 (D. Haw. 2012) (noting that the dissenters in *Davis* "foresaw the result in this case" because suppression was unwarranted in the absence of culpable conduct), *aff'd per curiam*, 554 Fed. Appx. 585, 586 (9th Cir. 2014).

We similarly take at face value the United States Supreme Court's clearly articulated standard for determining whether the good faith exception applies to a given case: "The pertinent analysis of deterrence and culpability is objective" and "'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (citation omitted). Under this standard, the inquiry must be focused on the "'flagrancy of the police misconduct' at issue," *Davis*, 564 U.S. at 238 (citation omitted), and employ the "last resort" remedy of exclusion only when necessary "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," *Herring*, 555 U.S. at 140, 144 (citation omitted).

### D.

In this case, the good faith inquiry raises two initial questions: What was the state of the law governing Officer Rhodes's search at the time that he conducted it, and what factual circumstances provided either clarity or ambiguity to Officer Rhodes in his presumed reliance upon that law? The issue, however, is not whether the automobile exception is categorically inapplicable to a portion of a private driveway within the curtilage absent some other legal basis for the police being there. The United States Supreme Court conclusively settled that issue in this case. Instead, we examine the state of the law at the time of the search and ask only the "'objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (citation omitted). For several reasons, we believe the answer to that question is "no."

10

At the time that Officer Rhodes searched the motorcycle, no binding precedent had held that the automobile exception was inapplicable to a vehicle parked in a private driveway located close enough to a home to be considered within the curtilage. This absence of direct precedent, by itself, does not sideline the exclusionary rule. But what does, we believe, is *Scher v. United States*, 305 U.S. 251 (1938), and the subsequent line of cases that applied the automobile exception to driveways without considering whether, and if so exactly where, the curtilage boundary might intersect with the driveway and thus put the automobile exception off limits.

In *Scher*, federal law enforcement officers conducted a warrantless search of a vehicle while it was parked in a detached "garage" that was "within the curtilage" of a residence. *Id.* at 253. The driver, after being arrested based upon contraband found during the search of the vehicle, moved to suppress the evidence. The trial court denied the motion. The defendant appealed to the Court of Appeals for the Sixth Circuit. Affirming the trial court, the Sixth Circuit acknowledged that the vehicle had been parked in a garage within the curtilage but nonetheless held that "[t]he garage was not searched." *Scher v. United States*, 95 F.2d 64, 65 (6th Cir. 1938) (per curiam). Relying in part on *Carroll v. United States*, 267 U.S. 132 (1925), the case that first recognized the automobile exception, the Sixth Circuit found that sufficient probable cause had existed for the search of the vehicle and thus that "[t]here was no unlawful search and seizure." *Scher*, 95 F.2d at 65.

On appeal to the United States Supreme Court, the defendant focused his argument on the assertion that "the garage in which the automobile was located and where the search was made, was within the curtilage of the petitioner-appellant's home and therefore within the protection of the Constitutional guarantees against unreasonable search and seizure." Appellant's Br. at 8,

11

*Scher*, 305 U.S. 251 (No. 49). "[T]he record clearly shows," he insisted, "that the garage of the petitioner-appellant was located within the curtilage of the petitioner's home and residence; [and] that the automobile at the time of the search was at rest and in said garage." *Id.* at 7. On brief, the defendant contested the proposition that the automobile exception applies when a vehicle is parked within the curtilage of a home:

> The [Sixth Circuit] in its opinion states the garage was not searched. We respectfully submit that such a statement is fallacious in view of the facts in this case. . . . While the automobile was the object that was searched, the search without a doubt was made *in the garage* of the defendant, and *therefore was a search of the garage itself*. . . . The [Sixth Circuit's] position that the garage was not searched is clearly erroneous. We, therefore, contend that the garage, which was searched by the officers without a search warrant, was part of the curtilage of the defendant's private dwelling, and, therefore, the search made was that of a private dwelling.

*Id.* at 25-26 (emphases in original).[7]

In response, the Solicitor General for the United States defended the Sixth Circuit's application of the automobile exception, asserting that it was "well established that the prohibition against search of a dwelling without a warrant does not include searches of vehicles made upon probable cause." Appellee's Br. at 16, *Scher*, 305 U.S. 251 (No. 49) (relying on *Carroll*, among other cases). That the vehicle had been parked in the garage was irrelevant, the Solicitor General argued. "No part of the garage or the petitioner's home was searched." *Id.* at 24. The vehicle was the "only thing searched." *Id.* Because the officers had probable cause to search the vehicle, "they were justified in making the search." *Id.* at 17.

---

[7] *See also* Appellant's Br. at 22, *Scher*, 305 U.S. 251 (No. 49) ("It is contended that the search of the garage in which the defendant's automobile was parked at the time of the search and seizure of the evidence herein, is part of the private dwelling occupied by the defendant since it is within the curtilage, and that, therefore, the search made in this matter was a search of a private dwelling.").

12

With the issue so framed, the United States Supreme Court held that the automobile exception had followed the vehicle *into* the curtilage:

> Considering the [automobile-exception] doctrine of *Carroll* . . . and the application of this to the facts there disclosed, it seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest. So much was not seriously controverted at the argument.
>
> Passage of the car into the open garage closely followed by the observing officer did not destroy this right. No search was made of the garage. Examination of the automobile accompanied an arrest, without objection and upon admission of probable guilt. The officers did nothing either unreasonable or oppressive.

*Scher*, 305 U.S. at 254-55 (citations omitted).

The logic of the first paragraph rests upon a simple premise: If the officers had the authority under the "doctrine of *Carroll*," *id.* at 254, to stop and search the vehicle *before* it entered the curtilage, they had the same authority *after* it did so. The second paragraph begins by restating this point: "Passage of the car into the open garage closely followed by the observing officer did not destroy this right." *Id.* at 255. This succinct statement necessarily presupposes that *Carroll* gave the officers an uninterrupted "right" to follow the vehicle "into the open garage," *id.*, an area undoubtedly within the curtilage. The automobile exception, therefore, authorized the officers' presence within the curtilage to search the vehicle.

With similar brevity, the remainder of the second paragraph addresses the conduct of the officers after they entered the detached garage. On this issue, *Scher* confirms that the officers searched only the vehicle, not the interior of the garage, and that they did not otherwise do anything — either in arresting the driver or in conducting a search incident to that arrest — that could be fairly described as "unreasonable or oppressive." *Id.* Nothing in the second paragraph

13

disclaims the first paragraph's reliance upon the automobile exception as the constitutional basis

for the officers' right to enter the curtilage to search the vehicle.

Many legal commentators, including those disagreeing with *Scher*, have interpreted that

case just as it was written — as an application of the *Carroll* automobile exception.[8]  The United

States Supreme Court has also stated that the automobile exception recognized in "*Carroll* was

followed and applied" in later cases, including *Scher*, *Chambers v. Maroney*, 399 U.S. 42, 49

(1970), and that *Scher* was an "application of *Carroll*," *United States v. Ross*, 456 U.S. 798, 818-

19 (1982).  No precedent, until the United States Supreme Court's recent ruling in this case,

expressly disclaimed the view that *Scher* had applied the automobile exception to a vehicle

parked within the curtilage of a home.[9]

---

[8] *See, e.g.*, Robert R. Barton, *The Automobile Search Warrant Exception in Texas — Have the Wheels Come Off?*, 28 Hous. L. Rev. 549, 554-56, 577 n.261 (1991); John W. Cook, III, *Automobile Inventories and the Fourth Amendment:* South Dakota v. Opperman, 38 Ohio St. L.J. 177, 182 & n.44 (1977); George M. Dery, III, *Improbable Cause: The Court's Purposeful Evasion of a Traditional Fourth Amendment Protection in* Wyoming v. Houghton, 50 Case W. Res. L. Rev. 547, 555 n.56 (2000); Joel S. Hjelmaas, *The Need for A Higher Standard of Exigency as a Prerequisite for Warrantless Vehicle Searches*, 71 Iowa L. Rev. 1161, 1165 n.43 (1986); George T. Perry, Jr., *The Fourth Amendment and Administrative Inspections*, 16 Hous. L. Rev. 399, 445 n.326 (1979); Brendan Peters, *Fourth Amendment Yard Work: Curtilage's Mow-Line Rule*, 56 Stan. L. Rev. 943, 954 n.68 (2004); William M. Phillips, *Toward A Functional Fourth Amendment Approach to Automobile Search and Seizure Cases*, 43 Ohio St. L.J. 861, 867 & n.70 (1982); Nichole K. Shimamoto, Wyoming v. Houghton*: The Bright Line Search Includes Passengers' Belongings*, 22 U. Haw. L. Rev. 645, 650 (2000).  Other legal commentators have described the *Scher* holding as ambiguous.  *See* Lewis R. Katz, *The Automobile Exception Transformed: The Rise of a Public Place Exemption to the Warrant Requirement*, 36 Case W. Res. L. Rev. 375, 388-89 & nn.69 & 72 (1985-86) (describing how the Court in *Scher* relied upon both the automobile exception and the search-incident-to-arrest doctrine and how "[t]he extent of judicial reliance upon the automobile exception was unclear"); Edward E. Pringle & Helen Garfield, *The Expanding Power of Police to Search and Seize: Effect of Recent U.S. Supreme Court Decisions on Criminal Investigation*, 40 U. Colo. L. Rev. 491, 494 n.34 (1968) (including *Scher* in a discussion of search-incident-to-arrest cases); *id.* at 495 & n.41 (including *Scher* in a discussion of hot-pursuit cases).

[9] Later cases addressed other aspects of this topic, but none overruled *Scher*.  *See, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 460 (1971) (plurality opinion) (suggesting that the automobile exception did not apply to a parked vehicle on a private driveway because there were

For our purposes, it is important that *Scher* did not authorize the officers' presence within the *residence* but rather within an open, detached *garage*. It would prove too much to say that, by applying the automobile exception to the curtilage, *Scher* implicitly would apply the same exception (at least for consistency's sake) to the interior of the residence. That slippery-slope argument may demonstrate why *Scher* was wrongly decided. But it does not refute the fact that *Scher* was decided and, right or wrong, it informs the good faith inquiry into whether a reasonably well-trained officer would have known that the automobile exception did *not* apply to a vehicle parked on a private driveway a few feet into the curtilage area outside of a home.

2.

In *Collins*, the United States Supreme Court interpreted *Scher* through the lens of its "case specific" facts and found fault with *Scher*'s "imprecise" reasoning, which seemed to rely on "multiple doctrines, particularly, and perhaps most appropriately, hot pursuit." *Collins*, 138 S. Ct. at 1674. The imprecision of *Scher* disqualified it from having any stare-decisis influence on the Court's analysis, especially in light of recent cases resurrecting the relevance of common-law property doctrines like the "ancient and durable" curtilage concept addressed in *Florida v. Jardines*, 569 U.S. 1, 6 (2013), *see United States v. Jones*, 565 U.S. 400, 405-11 (2012) (returning to a "property-based approach" to the Fourth Amendment without disclaiming the more recent privacy-based approach).

---

no exigent circumstances and because the car was not suspected to contain contraband or dangerous items). *But see Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (per curiam) (holding that no separate exigency requirement exists for the application of the automobile exception); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.").

At the time of the search, however, no reasonably well-trained officer would have known that *Scher* was "perhaps most appropriately" understood as an application of the "hot pursuit" exception to the warrant requirement, *Collins*, 138 S. Ct. at 1674, rather than an application of the *Carroll* automobile exception. Two United States Supreme Court opinions and a host of legal commentators had previously described *Scher* as an application of the automobile exception. The facts of *Scher* involved officers following a vehicle because of an informant's tip alleging that the car contained contraband. *See Scher*, 305 U.S. at 253. Nothing in the briefs or the various judicial opinions suggested that the officers had been chasing the driver in hot pursuit. *See* Appellant's Br. at 20, *Scher*, 305 U.S. 251 (No. 49) ("*The driver of the car was not in any hurry nor did he appear to be running away*." (emphasis in original)).[10]

Here, rather than disregard *Scher* as an inapplicable, hot-pursuit case, a reasonably well-trained officer could have (and likely would have) concluded that *Scher* authorized the search of the motorcycle. The relevant curtilage in this case is a small portion of the private driveway immediately adjacent to the house. As Officer Rhodes was walking up the driveway, he would have seen steps leading toward the front door. He also would have seen the driveway continue "a few yards past the front perimeter of the house," *Collins*, 138 S. Ct. at 1670, toward a side door. Two brick retaining walls "about the height of a car" partially enclosed those few yards of the driveway. *Id.* This partially walled-in section of the driveway was fully exposed to the public from the road and to anyone walking up the driveway to the front or side doors of the

---

[10] *See generally Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (rejecting a "hot pursuit" claim as "unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime" and because "there was little remaining threat to the public safety"); *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (finding that the facts of the case constituted a "true 'hot pursuit'" because the exception involves "some sort of a chase" and because the suspect had "retreat[ed] into her house," potentially "thwart[ing] an otherwise proper arrest").

house.  In contrast, the curtilage in *Scher* was a detached garage.  It seems highly improbable that a reasonably well-trained officer would have thought that the automobile exception — which *Scher* had seemed to find applicable to the interior of a detached garage — did not apply even more clearly to a portion of a private driveway completely in public view.

3.

This conclusion is strengthened by the fact that a considerable body of caselaw had developed that applied the automobile exception to driveways without considering whether, and if so where, the curtilage boundary might intersect with the driveway and thus put the automobile exception off limits.  *See, e.g.*, *United States v. Blaylock*, 535 F.3d 922, 926-27 (8th Cir. 2008) (per curiam); *United States v. Hines*, 449 F.3d 808, 814-15 (7th Cir. 2006); *United States v. Brookins*, 345 F.3d 231, 237-38 & n.8 (4th Cir. 2003); *United States v. Hatley*, 15 F.3d 856, 858-59 (9th Cir. 1994); *United States v. Markham*, 844 F.2d 366, 368-69 (6th Cir. 1988).

When this case was previously before us, we relied upon our own prior precedent, *Thims v. Commonwealth*, 218 Va. 85 (1977), for the proposition that "there is no reasonable expectation of privacy in a vehicle parked on private property yet exposed to public view."  *Collins*, 292 Va. at 501-02.  Acting upon the belief that a vehicle "had been purchased with stolen and forged checks and was the fruit of a crime, that it may have been stolen, and that it contained stolen property," the officer in *Thims* walked up a private, residential driveway and searched a parked vehicle.  *Thims*, 218 Va. at 88.  Like other courts in similar contexts, we upheld the search without any discussion of whether the parked car was located within the curtilage of the home.

The same can be said of the Fourth Circuit's opinion in *Brookins*.  In that case, police officers had searched a vehicle parked in the driveway of a "private residence" and the vehicle owner argued that "the automobile exception may never apply when a vehicle is stationed on

17

private, residential property." *Brookins*, 345 F.3d at 237. In a unanimous opinion, Judge Gregory rejected that argument, finding it unnecessary "to determine the contours of the expectation of privacy in and around one's private property" (a privacy-laden allusion to the curtilage concept without naming it as such) because no "bright-line rule preclud[ed] warrantless searches on private property under all circumstances." *Id.* n.8. Following *Brookins*, United States District Courts in Virginia came to the same conclusion. *See United States v. Brown*, No. 7:15CR00074, 2016 WL 685030, at *1-3 (W.D. Va. Feb. 18, 2016) (applying *Brookins* to a search of a vehicle parked on private, residential property), *aff'd per curiam*, 677 Fed. Appx. 827 (4th Cir. 2017); *United States v. Dyer*, No. 3:13-CR-229-1, 2014 WL 2481573, at *2, *4-6 (E.D. Va. June 3, 2014) (same).

After the United States Supreme Court's ruling in this case, police officers relying on the automobile exception must locate the curtilage boundary, if any, in every private-driveway-search case. But no judicial consensus had recognized the need to do so before this case. And *Scher*, *Thims*, *Brookins*, and other private-driveway cases in Virginia and elsewhere had strongly implied — if not outright held — that there was no such requirement. A reasonably well-trained police officer cannot be expected to have known that all of these courts were wrong. If our focus should be on the "'flagrancy of the police misconduct' at issue," *Davis*, 564 U.S. at 238 (citation omitted), we see no basis in this record for accusing Officer Rhodes of flagrantly ignoring his constitutional duties. That he mistakenly did so — particularly given our subsequent, equally mistaken, approval of his search — does not justify excluding otherwise admissible, probative evidence. It is true that "society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id.* at 237 (citation omitted).

18

II.

In summary, the Court of Appeals did not err by affirming Collins's conviction after the trial court had denied his motion to suppress. The exclusionary rule does not apply under the facts of this case because, at the time of the search, a reasonably well-trained police officer would not have known that the automobile exception did not permit him to search a motorcycle located a few feet across the curtilage boundary of a private driveway.

*Affirmed.*

JUSTICE McCLANAHAN, with whom CHIEF JUSTICE LEMONS and JUSTICE KELSEY join, concurring.

I fully concur in the majority opinion holding that the good faith exception to the exclusionary rule applies to this case because, at the time of the search, a reasonably well-trained police officer would not have known that the automobile exception did not permit him to search a motorcycle located a few feet across the curtilage boundary of a private driveway. I write separately, however, because in my view exigent circumstances were present here, as the Virginia Court of Appeals determined—accordingly providing an alternative basis for justifying the search under the Fourth Amendment.

Upon reversing this Court's earlier opinion holding that the automobile exception to the warrant requirement applied in this case, the United States Supreme Court specifically stated that "[w]e leave for resolution on remand whether Officer Rhodes' warrantless intrusion on the curtilage of Collins' house may have been reasonable on a different basis, such as *the exigent circumstances exception to the warrant requirement*." *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1670, 1675 (2018) (emphasis added).

19

"[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona,* 437 U.S. 385, 393-394 (1978)) (internal quotation marks omitted). "No fixed legal definition fully captures the meaning of exigent circumstances" due to the fact that "[p]olice officers find themselves in a myriad of situations with varied fact patterns" in which such circumstances may arise. *Evans v. Commonwealth*, 290 Va. 277, 283 (2015). For this reason, "[n]o court could provide an exhaustive enumeration of factors that would distinguish circumstances that qualify as exigent from those that would not," *id*. (footnote omitted), and the inquiry is therefore highly "fact-specific" upon a case-by-case review. *Robinson v. Commonwealth*, 273 Va. 26, 41 (2007) (quoting *Minnesota v. Olson,* 495 U.S. 91, 100 (1990)). Indeed, as the United States Supreme Court has stated, "the fact-specific nature of the reasonableness inquiry . . . *demands* that we evaluate each case of alleged exigency based on its own facts and circumstances." *Missouri v. McNeely*, 569 U.S. 141, 150 (2013) (citations and internal quotation marks omitted) (emphasis added). *See also Evans*, 290 Va. at 286-87 (explaining that this inquiry is based on "the totality of the facts demonstrating exigent circumstances" (citing *United States v. Aguirre*, 664 F.3d 606, 612 (5th Cir. 2011); *Cherry v. Commonwealth*, 44 Va. App. 347, 368 (2004))).

Still, as relevant here, when contraband is involved, we have recognized among other factors to be considered in making the exigency determination the following: "the officers' reasonable belief that contraband is about to be removed or destroyed"; "the possibility of danger to others" arising from leaving the contraband in place; "information that the possessors of the contraband are aware that the police may be on their trail"; "whether the offense is serious"; and

"whether there is, at the time of entry, a clear showing of probable cause." *Verez v. Commonwealth*, 230 Va. 405, 410-11 (1985); *see Robinson*, 273 Va. at 41-42.

"'Reasonableness'" nevertheless remains "the ultimate touchstone of the Fourth Amendment." *Stuart,* 547 U.S. at 403 (citing *Flippo v. West Virginia,* 528 U.S. 11, 13 (1999), and *Katz v. United States,* 389 U.S. 347, 357 (1967)). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Id*. (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978) (emphasis in original)); *see Evans*, 290 Va. at 287 ("[T]he proper inquiry focuses on what an objective officer could reasonably believe."). In this context, the United States Supreme Court has instructed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (quoting *Graham v. Connor,* 490 U.S. 386, 396–97 (1989)). Given this reality, the Court warned, "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Id*. Accordingly, the standard of objective reasonableness for a warrantless search "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham*, 490 U.S. at 396). When undertaking this assessment on appeal, we do so under a de novo standard of review. *Robinson*, 273 Va. at 39 ("The issue of whether an officer acted with probable cause and under exigent circumstances . . . is a mixed question of fact and law that we review de novo." (citing *Brown v. Commonwealth*, 270 Va. 414, 419 (2005))). Applying these principles, I conclude, as did the Court of Appeals, that Officer

21

Rhodes' warrantless search of the motorcycle at issue was based on both probable cause and exigent circumstances. *See Collins v. Virginia*, 65 Va. App. 37, 44-48 (2015).

Collins challenged the existence of probable cause in his initial appeal to the Court of Appeals and this Court; however, he has abandoned that argument on remand. Collins now argues that the only remaining issue is exigent circumstances.[1] Appellant's Br. at 9-10. With probable cause for a search of the motorcycle to confirm its identity having been conceded, the need for Officer Rhodes' warrantless search should be viewed as compelling, and thus reasonable under the exigent circumstances exception to the warrant requirement, based on the following set of circumstances:

- The motorcycle was readily movable and capable of moving quickly.

- Someone in the residence where the motorcycle was located could have quickly and easily jumped on the motorcycle and sped off with it. There was simply no way for the police to know whether or not the residence was occupied by one or more individuals, as there was no basis to search the residence.[2]

---

[1] To be clear, Collins does not challenge, on procedural grounds, whether we can decide this appeal on the issue of exigent circumstances as an alternative ground for upholding the ruling of the circuit court to deny Collins' suppression motion—as did the Court of Appeals in ruling to affirm the circuit court on this alternative ground of exigent circumstances. Collins fully recognizes that we have the authority to do so to the extent "the record demonstrates that all evidence necessary to the alternative ground for affirmance was before the circuit court." Appellant's Br. at 8 (quoting *Banks v. Commonwealth*, 280 Va. 612, 618 (2010)). It is simply Collins' position that the record does not prove a "justification [for the warrantless search] by exigent circumstances" on the merits. *Id*. at 9 (quoting *Verez v. Commonwealth*, 230 Va. 405, 410 (1985)). For the reasons that follow, I disagree and would affirm the Court of Appeals in upholding the circuit court's denial of Collins' suppression motion on this alternative basis.

[2] Challenging the exigency of the circumstances, Collins places great reliance on Officer Rhodes' purported testimony at Collins' preliminary hearing in general district court that no one was in the residence when he removed the tarp to examine the motorcycle. The problem with this position is that Officer Rhodes did not so testify in circuit court at either the hearing on Collins' motion to suppress the search of the motorcycle or at trial. Also, no transcript of the preliminary hearing was introduced as evidence either at the suppression hearing or at trial. "When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later

22

- Given Collins' encounter with the police at the DMV approximately 30 minutes before the motorcycle was searched, Collins knew that the police were aware of the motorcycle's location. Officer Rhodes testified that he believed Collins was "probably on the way" there at the time and, so, the officer "waited for him to arrive at the residence there."

- The motorcycle had twice been used to elude the police at dangerously high speeds—100 miles per hour the first time, and in excess of 140 miles per hour the second time. Such episodes obviously pose a serious risk to the public.

- Officer Rhodes' intrusion into the curtilage was minimal, given that the location of the motorcycle was only "a car length or two" from the street.

This case is analogous to *Thims v. Commonwealth*, 218 Va. 85, 91 (1977). In *Thims*, this Court concluded that exigent circumstances justified a warrantless search of a vehicle parked in a private driveway of a residence. *Id*. at 90–93. Although the defendant and three other suspects had been taken into custody the previous evening, along with what turned out to be the keys to the vehicle in the driveway, the investigating officer "had no way of knowing who else might have keys to the vehicle," other people "might have had motives to remove it while [the officer] took the additional time to get a warrant," and the defendant "himself might have telephoned to a

---

presented at trial." *Tirando v. Commonwealth*, 296 Va. 15, 24-25 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)). When considering whether to reverse the denial of a pretrial suppression motion, we review the evidence at trial only if the appellant "renews his pretrial motion at trial" and by doing so "satisfy[ies] Rule 5:25 by inviting the trial court to reconsider its pretrial ruling in light of the actual evidence presented — rather than merely relying solely upon the charging documents, pretrial proffers of the parties, or cursory evidentiary presentations as the trial court sometimes must do when deciding the issue prior to trial." *White*, 293 Va. at 414 n.2. Collins cites no Virginia precedent, nor are we aware of any, holding that a denial of a suppression motion can be reversed on appeal based upon evidence never presented to the court that denied the motion to suppress. It is nevertheless apparent from a review of Officer Rhodes' testimony at the suppression hearing and at trial that he neither searched the house where the motorcycle was located nor had any authority to do so. Therefore, he had no way of knowing during the short time that he was at the scene whether one or more individuals were in the residence, and any purported statement by him that no one was there would have necessarily been mere speculation. To be sure, from the circuit court judge's point of view, it would be unreasonable to infer that the residence was vacant unless some evidence suggested as much. And it would be far more reasonable to infer that the officer *did not know whether or not* there was anyone in the residence at the time of the search.

23

friend, relative, or confederate to remove the car, or he might have been released on bail, and, during [the officer's] absence to obtain a warrant, removed the car himself." *Id*. at 91. *See also Keeter v. Commonwealth,* 222 Va. 134, 142 (1981) (finding a warrantless entry into a dwelling was justified by exigent circumstances, particularly given the officers' "chief concern" that two suspects who had left the residence would observe police activity at a separate location and "get word back to the residence to get rid of the incriminating evidence"); *Fore v. Commonwealth*, 220 Va. 1007, 1012–13 (1980) (holding that even though the defendant was in custody when the search occurred, "exigent circumstances justified the officer's failure to obtain a search warrant" because the officer "could reasonably fear that [an accomplice], or [the defendant's] mother–in– law, or some confederate or friend, might appear at [the car dealership], pay the repair bill, and remove the car"); *Patty v. Commonwealth*, 218 Va. 150, 157 (1977) ("Another car loaded with more of defendant's companions, one of whom may have had another key to the [vehicle's] ignition, could have arrived at any time, paid the repair bill, required [the store owner] to replace the ignition coil and driven the load of marijuana away.").

While the prevailing legal standard for probable cause under Fourth Amendment jurisprudence "protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,'" it also gives "'fair leeway for enforcing the law in the community's protection.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). The warrantless search in this case falls squarely within that leeway because, in my opinion, it was justified by the above-stated exigencies.

Accordingly, I would affirm the judgment of the Court of Appeals and uphold Collins' conviction for these additional reasons.

24

JUSTICE MIMS, joined by SENIOR JUSTICE KOONTZ, dissenting.[1]

In this appeal, the majority concludes that evidence discovered during a warrantless search of a covered object located within the curtilage of a residence was admissible under the good-faith exception to the exclusionary rule. Writing in a separate concurrence, Justice McClanahan, joined by two colleagues, also concludes that the warrantless search was justified by exigent circumstances. Because the majority's conclusion requires an extension of the good-faith exception beyond the scope of the Supreme Court of the United States' current holdings on that subject, and because I believe the circumstances were not exigent and did not justify a warrantless search, I disagree with both opinions and respectfully dissent.

Although the majority declines to review the facts of this case, they necessarily define the analysis of the legal principles at issue here. I restate them for the convenience of readers and to ensure that particularly salient facts are not overlooked.

On July 25, 2013, Officer David Rhodes of the Albemarle County Police Department was traveling on the U.S. Route 250 Bypass in an unmarked police car. The only other vehicle in sight was a motorcycle approaching him from the rear at a high rate of speed. Officer Rhodes activated his car's radar, which indicated that the motorcycle was traveling at 100 miles per hour. The maximum speed limit was 55 miles per hour.

The motorcycle overtook Officer Rhodes, passing him so close that he "could almost reach out and touch the driver." He saw that it was an orange and black Suzuki. The body had been customized, its rear end extended for racing. It also had chrome wheels and a chrome

---

[1] Justices Goodwyn and Powell concur in Part A of the dissent addressing exigent circumstances, *see infra* at 29-33, but join in full the majority opinion affirming the judgment based upon the good faith exception to the exclusionary rule, *see ante* at 1-19.

swing arm connecting the rear wheel to the extended body. The driver wore a helmet with a tinted face shield that obscured his or her identity.

Officer Rhodes activated his emergency lights and siren and attempted to stop the motorcycle. Rather than stop, the motorcycle accelerated to more than 140 miles per hour and merged onto Interstate 64. Assessing the situation to be too dangerous to follow, Officer Rhodes discontinued his pursuit.

Officer Rhodes had noted the motorcycle's license plate number. He later ascertained that the Department of Motor Vehicles ("DMV") had no active record for it. Using a separate law enforcement database, he ascertained that the license plate had earlier been recorded on another motorcycle whose driver had been issued a summons. An informant supplied Officer Rhodes with information that led him to believe that the motorcyclist who was associated with the license plate had sold a motorcycle fitting the description of the one that had passed him on Route 250 to Ryan Austin Collins.

On September 10, 2013, Officer Rhodes heard a police radio transmission that officers were responding to a local DMV branch because Collins was attempting to register a car that officers believed had been reported stolen in New Jersey.[2] Officer Rhodes went to the DMV branch to speak to Collins about the motorcycle. He arrived at about the same time as Officer Matthew McCall, another Albemarle County police officer who wanted to speak to Collins about a similar incident that had occurred on June 4.

While various officers spoke with Collins about the motorcycle and the car he was attempting to register, Officer Rhodes accessed Collins' Facebook page and saw photographs showing what Officer Rhodes believed to be the motorcycle he had attempted to stop in July.

_____

[2] The car had in fact not been stolen.

26

One of the photographs showed the motorcycle parked outside a house, but he was unable to determine its location. He showed the photographs to Collins, who denied any knowledge of it. Collins eventually left the DMV.

Officer Rhodes quickly ascertained that the house shown in the photograph was on Dellmead Lane in the City of Charlottesville. Within thirty to sixty minutes after Collins left the DMV, Officer Rhodes and another officer, Officer Litton, went to the address and saw, from the public street, an object in the driveway of the house. The object was in an area of the driveway beyond the steps to the front porch and within a few feet of the side wall of the house, and therefore within the curtilage. The object appeared to be a motorcycle covered with a white cover or tarpaulin, showing a partially-exposed chrome front wheel and the silhouette and contours of an extended body. These features were consistent with the motorcycle that Officer Rhodes had encountered in July.

Officer Rhodes entered the driveway and took a photograph of the covered object. He then removed the cover to reveal an orange-and-black Suzuki motorcycle with an extended body, chrome wheels, and a chrome swing arm. He was certain it was the motorcycle he had encountered in July. He took a photograph of the uncovered motorcycle. He ascertained that the license plate did not match the one he had noted during the July encounter. He searched DMV records for the plate number on the motorcycle in the driveway and ascertained that it was registered to a Kawasaki motorcycle in Waynesboro. He checked the motorcycle's vehicle identification number ("VIN") and ascertained that it had been reported stolen.

Officer Rhodes knocked on the front door of the house. Collins answered and stepped outside. Officer Rhodes noted that Collins had changed clothes from the shorts, t-shirt, and flip-flops he had been wearing at the DMV into jeans, a long-sleeved shirt, and a pair of boots.

27

Officer Rhodes asked Collins about the motorcycle and he again denied any knowledge of it. He eventually changed his story and said that it belonged to a friend. He said that he had driven it about a week earlier from his mother's house to the Dellmead Lane address. During this conversation, Officer McCall notified Officer Rhodes that he had confirmed that Collins had taken a 2008 Suzuki motorcycle to a local automotive store, which had serviced a motorcycle for Collins.[3] The VIN on the store's invoice matched the VIN on the motorcycle in the driveway by all but one digit. When confronted with this information, Collins again changed his story and admitted that he had driven the motorcycle to the store to have its tires replaced.

Officer Rhodes then arrested Collins. During a search incident to the arrest, Officer Rhodes discovered a key to the motorcycle in Collins' pocket. Collins was later indicted for buying or receiving stolen property, in violation of Code § 18.2-108. Prior to his subsequent bench trial, he filed a motion to suppress the evidence obtained in the search at Dellmead Lane. The court denied the motion, convicted Collins of the offense, and sentenced him to three years' incarceration, which was suspended except for jail time already served. The court's ruling on the motion to suppress has been the subject of Collins' appeals to the Court of Appeals, *Collins v. Commonwealth*, 65 Va. App. 37 (2015) (*Collins I*), to this Court, *Collins v. Commonwealth*, 292 Va. 486 (2016) (*Collins II*), and to the Supreme Court, which has remanded it to us. *Collins v. Virginia*, 138 S. Ct. 1663, 1675 (2018) (*Collins III*).

In reviewing whether evidence was seized in violation of the Fourth Amendment, we give deference to the circuit court's factual findings but independently determine whether the

---

[3] Officer Rhodes testified that he had received information that Collins had taken the motorcycle to the store, and that he had instructed Officer McCall to confirm the information there. The transcript of the suppression hearing does not specify how or when Officer Rhodes obtained the information, or when he shared it with Officer McCall.

manner in which the evidence was obtained meets the constitutional requirements. When the

Commonwealth conducts a search without a warrant, it bears the burden of proving the

legitimacy of the search. *Reittinger v. Commonwealth*, 260 Va. 232, 235-36, (2000) (internal

quotation marks omitted); *Simmons v. Commonwealth*, 238 Va. 200, 204 (1989) (citing *Coolidge*

*v. New Hampshire*, 403 U.S. 443, 455 (1971) and *Vale v. Louisiana*, 399 U.S. 30, 34 (1970)); *see*

*also United States v. Jeffers*, 342 U.S. 48, 51 (1951) ("[T]he burden is on those seeking the

exemption [to the warrant requirement] to show the need for it."); *McDonald v. United States*,

335 U.S. 451, 456 (1948) ("We cannot be true to th[e] constitutional requirement and excuse the

absence of a search warrant without a showing by those who seek exemption from the

constitutional mandate that the exigencies of the situation made that course imperative.").

## A.  EXIGENT CIRCUMSTANCES

"The Fourth Amendment protects the people against unreasonable searches and seizures,

but not those which are reasonable in the circumstances." *Verez v. Commonwealth*, 230 Va. 405,

410 (1985). "Exigent circumstances . . . may justify as reasonable a warrantless entry into a

dwelling," *id.*, which for Fourth Amendment purposes includes its curtilage. *Robinson v.*

*Commonwealth*, 273 Va. 26, 34 (2007); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013).

While

> [n]o court has, to our knowledge, attempted to formulate a final and
> comprehensive list of all exigent circumstances which might justify a warrantless
> entry, . . . some of those considered relevant have been: (1) the degree of urgency
> involved and the time required to get a warrant; (2) the officers' reasonable belief
> that contraband is about to be removed or destroyed; (3) the possibility of danger
> to others, including police officers left to guard the site; (4) information that the
> possessors of the contraband are aware that the police may be on their trail; (5)
> whether the offense is serious, or involves violence; (6) whether officers
> reasonably believe the suspects are armed; (7) whether there is, at the time of
> entry, a clear showing of probable cause; (8) whether the officers have strong
> reason to believe the suspects are actually present in the premises; (9) the

29

likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

We have held that in determining whether exigent circumstances were sufficient to overcome the presumption of unreasonableness and justify a warrantless entry, the court must examine the circumstances as they reasonably appeared to the law enforcement officers on the scene. The officers are not required to possess either the gift of prophecy or the infallible wisdom that comes only with hindsight. They must be judged by their reaction to circumstances as they reasonably appeared to trained law enforcement officers to exist when the decision to enter was made.

*Verez*, 230 Va. at 410–11 (internal citations and quotation marks omitted).

The Commonwealth argues that Officer Rhodes' warrantless entry into the curtilage was reasonable because of "the presence of a stolen motorcycle that twice had been used to elude the police at dangerously high speeds; the possibility that someone was home; the likelihood that Collins would arrive soon to remove the motorcycle; and the risk that waiting to confront Collins would result in another dangerous—and potentially futile—high-speed chase." It also notes that Officers Rhodes and McCall had just confronted Collins about the motorcycle at the DMV, and that Officer Rhodes had just shown him a photograph of it parked at the Dellmead Lane address, so they had good reason to believe that he or an accomplice acting on his instructions might go there to remove it. Officer Rhodes therefore had no way of knowing whether Collins or the hypothetical accomplice was on the way or was already in the house. Officer Rhodes could reasonably have believed that he lacked the time to obtain a search warrant, or that if he asked Officer McCall to do so, it would not arrive in time.[4]

Justice McClanahan adopts many of these arguments in her concurring opinion, and stresses that courts should not second-guess, with the benefit of hindsight, officers' judgments on

---

[4] The Commonwealth's brief on remand makes no mention of Officer Litton, who Officer Rhodes testified was already with him at the Dellmead Lane address when he made the decision to search the object in the driveway. Neither do the majority or concurring opinions.

the scene. These asserted justifications are not persuasive, though, even in light of the scene as Officer Rhodes described it in his testimony. It is true that Officer Rhodes had probable cause to believe that the object in the driveway was the motorcycle that had twice eluded police at high speed. But based on the evidence, he had no reason to believe at the time that he decided to enter that the motorcycle had been stolen. To the contrary, his informant had told him that Collins bought it.

It is also true that motorcycles are mobile. But the motorcycle here could not be immediately driven, despite Justice McClanahan's assessment that "someone . . . could have quickly and easily jumped on [it] and sped off." *Ante* at 22. The photograph Officer Rhodes took shows that the cover was form-fitting, gathered at the bottom with a tie-cord or elastic, and completely obstructed the motorcycle's rear wheel, ignition, and controls. The photograph also shows that the motorcycle was parked with the partially-revealed front wheel abutting the sport-utility vehicle parked in front of it in the driveway, and that the sides of the driveway were enclosed by the wall of the house on one side and a retaining wall nearly as tall as the sport-utility vehicle on the other. The photograph shows that the driveway was scarcely wider than the sport-utility vehicle. Thus, driving the motorcycle away would first require Collins or the hypothetical accomplice to approach it; remove the cover (which, incidentally, would have exposed it to plain view); either back it out of the driveway for the length of the retaining wall or attempt to turn it around, if the narrow width of the driveway between the retaining wall and the house accommodated the turning radius increased by its extended body; mount it; and turn it on.

Consequently, even viewing the evidence adduced at the suppression hearing in the light most favorable to the Commonwealth, it strains credulity to suggest that neither Officer Rhodes nor Officer Litton could have secured the driveway to prevent anyone from removing the

31

motorcycle while the other went to obtain a warrant to search it. The Supreme Court has repeatedly upheld police officers' authority to temporarily secure a location when they have probable cause to believe that evidence of a crime will be found there, to prevent the removal or destruction of such evidence while a search warrant is obtained. *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001); *United States v. Place*, 462 U.S. 696, 701 (1983) (collecting cases); *see also Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978) (noting that presence of a police guard at a suspect's apartment contradicted the asserted need to search it without a warrant to prevent the loss, destruction, or removal of evidence therefrom).[5]

The Supreme Court has expressly upheld this principle as constitutionally valid even though securing the location effects a seizure for Fourth Amendment purposes. *Segura v. United States*, 468 U.S. 796, 809-810 (1984). Such a limited seizure is not unreasonable when grounded on probable cause because it implicates only, and only temporarily, the suspect's possessory interests rather than his or her privacy interests. *Id.* at 810. "[A] seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a seizure of premises, not a search, is at issue. [S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.*

The Commonwealth notes that in *Thims v. Commonwealth*, 218 Va. 85, 92 (1977), we held that an officer who had probable cause to seize a car in a driveway could proceed to search

---

[5] Even *Verez*' non-exclusive list of factors to consider when determining whether exigent circumstances exist to justify a warrantless search acknowledges the possibility of securing a location to preserve evidence while waiting for a warrant. The third factor allows officers to consider whether those left behind to secure the location would be in danger. 230 Va. at 410. Nothing in the record indicates that Collins had a propensity for violence.

it for evidence, and Justice McClanahan agrees that *Thims* is analogous to this case. However, that ruling was based on *Schaum v. Commonwealth*, 215 Va. 498, 501 (1975), which justified such searches on the automobile exception and the inventory exception. Neither of these is relevant here. The inventory exception applies to property taken from the possession of an arrested person for safekeeping. *Cabbler v. Commonwealth*, 212 Va. 520, 522-23 (1971). The Supreme Court has now instructed us that the automobile exception will not justify a warrantless search of an automobile within the curtilage, because there must be a justification for entry upon the curtilage before the presence of an automobile there triggers the exception. *Collins III*, 138 S.Ct. at 1671. But even before the Supreme Court decided *Collins III*, its holdings in *McArthur*, *Place*, and especially *Segura* had already undermined the viability of our ruling in *Thims*, which failed to consider the constitutional differences between possessory and privacy interests and between a limited seizure to secure evidence until a search warrant arrived and a search with no warrant at all.[6]

I therefore conclude that either Officer Rhodes or Officer Litton could have secured the driveway while the other obtained a search warrant, thereby preventing the removal of the object that Officer Rhodes had probable cause to believe was the motorcycle that had eluded him on July 25. Consequently, exigent circumstances did not justify entry to perform a warrantless search.

## B. THE "GOOD-FAITH" EXCEPTION

In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court considered whether the exclusionary rule prohibited the admission of evidence discovered in a search that conformed

---

[6] I also note that unlike Officer Rhodes in this case, who was accompanied by Officer Litton, the officer in *Thims* was alone. 218 Va. at 88.

to then-binding constitutional precedent.  In April 2007, Alabama police officers executed a traffic stop that resulted in the arrest of the driver and her passenger.  The officers handcuffed them, placed them in patrol cars, and searched the vehicle.  The passenger was subsequently prosecuted and convicted in federal court for possession of a firearm by a convicted felon on the basis of evidence discovered during the search.  *Id.* at 235.

At the time of the search, the officers' conduct wholly conformed to an interpretation by the United States Court of Appeals for the Eleventh Circuit (which includes Alabama) of the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454, 459-60 (1981) (holding that an officer may search the passenger compartment of a vehicle without a warrant as a search incident to the arrest of its occupants).  Although the four suspects in *Belton* were unrestrained at the time of the search, *id.* at 456, the Eleventh Circuit had extended the decision's reasoning to uphold searches even when suspects had been restrained.  *Davis*, 564 U.S. at 235 (citing *United States v. Gonzalez*, 71 F.3d 819, 822, 824–827 (11th Cir. 1996)).

While Davis' appeal was pending, *Davis*, 564 U.S. at 236, the Supreme Court decided *Arizona v. Gant*, 556 U.S. 332 (2009), in which it held that a warrantless search of a vehicle's passenger compartment incident to the arrest of an occupant was constitutional only "(1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest."  *Davis*, 564 U.S. at 235 (construing the fractured opinion in *Gant*) (internal quotation marks omitted).  Consequently, the Alabama officers' 2007 search was now unconstitutional in light of *Gant* because the occupants of the car had been handcuffed and placed in patrol cars.

Considering whether the evidence discovered in the search should have been excluded, the Supreme Court reviewed the history and purpose of the exclusionary rule and the exceptions

34

it had recognized in *United States v. Leon*, 468 U.S. 897, 922 (1984) (upholding the admissibility of evidence discovered during a search based on objectively reasonable reliance on a warrant later determined to be invalid); *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (same); *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (upholding the admissibility of evidence discovered during a search based on objectively reasonable reliance on a statute later determined to be unconstitutional); *Arizona v. Evans*, 514 U.S. 1, 14 (1995) (upholding the admissibility of evidence discovered during a search based on objectively reasonable reliance on an erroneous database entry indicating the ongoing validity of a previously quashed warrant); and *Herring v. United States*, 555 U.S. 135, 137 (2009) (same). *Davis*, 564 U.S. at 236-39. It extended the line of reasoning in these cases and concluded that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241. The evidence from the Alabama officers' 2007 search therefore was admissible because they had relied on the Eleventh Circuit's then-binding interpretation of *Belton*. *Id.* at 249.

In this case, the Commonwealth argues, and the majority agrees, that we should affirm because Officer Rhodes may have reasonably relied on *Thims*, which they assert was binding precedent before the Supreme Court's ruling in *Collins III*.[7] The majority also offers an alternative precedent, *Scher v. United States*, 305 U.S. 251 (1938). However, neither of these

---

[7] The majority also cites *United States v. Brookins*, 345 F.3d 231 (4th Cir. 2003). In that case, Suffolk police officers searched a vehicle in a driveway without a warrant and discovered evidence leading to a prosecution in federal court for violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii), and 18 U.S.C. § 2. The United States Court of Appeals for the Fourth Circuit (which includes Virginia) upheld the search under the automobile exception and other theories. *Id.* at 236-39. However, unlike the defendants in *Brookins* and *Davis*, Collins was prosecuted in state, not federal, court. Decisions of federal courts other than the Supreme Court of the United States are not conclusive in state court, *e.g.*, *Toghill v. Commonwealth*, 289 Va. 220, 227 (2015), and officers cannot reasonably rely on them as binding precedent for the purposes of the good-faith exception in Virginia courts.

cases is binding precedent because they are distinguishable. *See United States v. Sparks*, 711 F.3d 58, 64 (1st Cir. 2013) (collecting cases and noting that before *Davis*, federal courts that had recognized the exception had held it to be available only where the police rely on precedent that is "clear and well-settled," that the "precedent on a given point must be unequivocal," and that nothing in *Davis* undermined these limitations).

In *Thims*, as discussed above, we upheld the search of a vehicle in a driveway simply because the police officer had probable cause to seize it. 218 Va. at 92. But this holding was obsolete after *Segura*, which differentiated between a temporary seizure to secure evidence while a search warrant is obtained, on the ground of the defendant's limited, possessory interest in the property, compared to a warrantless search, which infringed on the more substantial privacy interest. 468 U.S. at 810.

In *Scher*, the Supreme Court articulated three reasons for upholding a vehicle search in a garage, but none of them apply here. First, the officers had actively followed the car from a public highway into the defendant's driveway and garage. 305 U.S. at 253. The Court reasoned that the automobile exception recognized in *Carroll v. United States*, 267 U.S. 132 (1925) would have allowed the officers to search the car if they had stopped it on the public highway, so its entry into the driveway and garage was an arbitrary distinction that not even the defendant had seriously asserted. *Id*. at 254-55. Second, although the car was examined within the garage, the garage itself was not searched, so there was no search of the curtilage. *Id.* at 255. Third, the search was incident to arrest. *Id.*

Each of these reasons is inapplicable to this case. First, Officers Rhodes and Litton did not follow the motorcycle to the Dellmead Lane address; they found it when they arrived there. Second, unlike the cars in both *Thims* and *Scher*, the motorcycle was not in plain sight. The

36

motorcycle was concealed by the cover. In order to identify the motorcycle, Officer Rhodes had to remove the cover, thereby executing a search. Third, the search was not incident to arrest because it occurred before Collins emerged from the house, was questioned by Officer Rhodes, and arrested. Consequently, Officer Rhodes could not reasonably rely on either *Thims* or *Scher* to believe that the warrantless search was constitutional.

The majority opines that *Davis* should be construed more broadly. The majority opinion contends that constraining the exception created in that case to apply "only where binding appellate precedent had specifically authorized a search or seizure" is to take a "limited view" of the Supreme Court's ruling. *Ante* at 6. It invokes broader language to advocate that courts should assess the admissibility of the evidence based on whether the police engaged in "misconduct" or whether the constitutional violation was "deliberate, reckless, or grossly negligent"; where they acted in "reasonable good faith," or even "simple, isolated negligence," evidence obtained through an unconstitutional search should be admitted because there is no deterrent value in excluding it. *Ante* at 8-10 (internal quotation marks omitted). However, as we recently observed,

> our duty to follow binding precedent is fixed upon case-specific holdings, not general expressions in an opinion that exceed the scope of a specific holding. We believe the very concept of binding precedent presupposes that courts are bound by holdings, not language. This limiting principle exists because words in judicial opinions are to be read in the light of the facts of the case under discussion.

*Jones v. Commonwealth*, 293 Va. 29, 56 (2017) (internal quotation marks, alteration, and citations omitted), cert. denied sub nom. *Jones v. Virginia*, 138 S.Ct. 81 (2017).

The Supreme Court clearly limited its own holding in *Davis*. It said, "[t]he question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent." 564 U.S. at 239. It answered that

37

question by holding that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241. I, too, "believe that the United States Supreme Court did mean what it said in *Davis*." *Ante* at 8.

"The question before us . . . is what the law is now, not what it may be in the future. We are not in the speculative business of plotting the future course of federal precedents." *Jones*, 293 Va. at 57 (internal quotation marks omitted). The law now is that evidence obtained in a warrantless search is admissible if the officer reasonably relied on binding precedent. Officer Rhodes did not.

## C. CONCLUSION

I acknowledge that it is unreasonable for a court to expect police officers investigating a crime to analyze the circumstances of a search with the nuanced analysis of a judge or law professor, but where there is ambiguity (especially when contemplating a search of a home or its curtilage) and the circumstances are not so exigent that a warrant cannot be obtained before the evidence is lost, removed, or destroyed, they should err on the side of obtaining one. *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

The Supreme Court has recognized exceptional circumstances in which warrantless searches may be conducted despite the Fourth Amendment's warrant requirement, not exceptional circumstances in which the Fourth Amendment requires a warrant. This is a fundamental question of whether the government has a right to search or whether a citizen has a right to privacy. The Founders protected only the latter in the Constitution.

For these reasons, I respectfully dissent.